We are now going to move to appeal 21-1104, United States v. Rapheal Seay. We're going to begin with oral argument from Mr. Walter. Thank you, Your Honor, and may it please the Court. This case is about the minimum due diligence required under the Fourth Amendment to transfer probable cause from one officer to another. Mr. Seay was stopped for a traffic violation, but Officer Babcock, who made the stop, did not witness that violation. Instead, Babcock was part of a five-way call involving multiple modes of communication and communication devices and officers speaking over each other. Given these circumstances, the District Court found it understandable that Babcock was confused and that it wasn't clear who communicated what to whom. But the District Court erred in holding that these facts regarding how the information was conveyed didn't matter so long as what was conveyed constituted probable cause. But courts shouldn't fill in these gaps, as this Court made clear in Wilburn. To get the benefit of the collective knowledge doctrine, officers need to establish a clear chain of communication. Before depriving someone of their liberty, the government must turn square corners, and the corner here is straightforward. At a minimum, it requires that officers identify the source of the request at the time of the stop. Being able to identify the source of the request is necessary to satisfy two elements of the collective knowledge test that this Court described in Wheeler. First, that the stopping officer acted in objective reliance on the request. And second, that the source of the request themselves had the requisite level of suspicion. These elements are designed to give us confidence in the credibility of the stop and its request, but no such confidence is warranted here. First, it's necessary to establish objective reliance because this Court has always required more than merely someone told me something before an officer makes a stop. The facts here in the District Court's language are similar to that found in Wilburn. In Wilburn, there was radio communication between the officers, and they eventually, quote, determined that they wanted the vehicle stopped. But it wasn't clear exactly who communicated what to whom before the stop was actually made. As this Court said, one might presume that the requisite information was transferred, but it refused to bridge that gap for the officers. Similarly here, the District Court described that the information was communicated, but didn't identify an agent or exactly the mode of communication. Similarly, in Rear and Ellis, this Court described how the extent of the communication was unclear or how the officers couldn't hear exactly what was being said from one to another. And so, again, they refused to make inferences and bridge the gap for the officers. The identity of the requesting officer is a necessary component of this objective reliance to ensure that there was sufficient communication at the time of the stop. At bottom, that's because ad hoc officer assistance, rather than established teams, which I'll discuss later, present risk for abuse of a doctrine that is otherwise critical to forming large teams to tackle large-scale crimes. Even accepting the District Court's evidentiary findings, we can still recognize that this is the kind of sloppy police work potentially cleaned up after the fact. Given here, there were changed stories between the police reports, evidentiary hearing, and even the trial. The fact that there was no definitive identity of the requesting officer, even after the evidentiary hearing. The fact that the District Court itself recognized that the communications were hectic and confused, and Babcock wasn't sure who told him what. Mr. Walter, can I pause you? It surprised me to see you argue that the evidentiary hearing did not result in a finding of where Officer Babcock got this from. And I did a bit of a double-take on that. And when I look at the District Court opinion, I think it's both on the surface and between the lines that Babcock got it from Scheparsky. And the reason I – if you look at no other – look at A14, for example. At the very bottom, it says, Investigator Scheparsky provided the necessary facts to support probable cause to stop Mr. Say's vehicle, etc. Well, those were provided to Babcock because Babcock did the stop. So where am I going wrong there? Yes, Your Honor. So the District Court said that there. The District Court also credited Babcock's testimony at the evidentiary hearing, saying that they told him, but not identifying a specific officer. Even when the government lawyer at the evidentiary hearing urged Babcock and said, well, didn't you hear it from Scheparsky? He still didn't make a definitive statement that he heard it from Scheparsky, and instead said that he was confused, not sure, and that they told him. The District Court also said that Babcock was relying – or objectively relying on Scheparsky and Henderson, and that the information was communicated. So even at one point when the District Court is sort of recapping what happened at the evidentiary hearing, it's not clear that it made a definitive finding about which officer communicated it. And even if it were the case that the District Court did definitively determine that Scheparsky was the one that gave the information or tried to give the information to Babcock, our rule and objective reliance for this Court requires that the recipient of that information be able to identify the source of the request in order to ensure that the collective knowledge doctrine isn't abused. Otherwise, it would make it too easy for a given stopping officer to merely say that any number of a group of officers told him to make the stop and then clean up those facts later or go shopping for probable cause at the station. But this Court has required more, particularly when there was not close – or particularly when there was not an established investigation before this time. So the District Court here found that there was close communication, but merely close communication has only been permitted in two situations, as this Court described in Nabsger. First, when they're physically on the same scene, involving physical exigencies which simply aren't present here and the government hasn't contended. Or that physical limitation need not be taken literally if the officers are active members of an established investigation. So, for instance, in Nabsger, that involved a large area and several criminals and an established communication system. Or in Williams, where the DEA was cooperating with a local police department, that involved a command post and institutional briefing officers before the local officers went out into the field. That's a recognition that these sorts of institutional imprimatures put on communications before officers go out into the field establish or pre-establish a body of communications and known purpose and cooperation between these officers, which permits more easy verification and more confidence that the officers actually communicated probable cause before making the stop. Similarly, identifying the source of the request is necessary to ensure that source had the requisite level of suspicion. Similarly to the stopping officer, a requesting officer who is unsure about his level of suspicion should not be able to stand behind anonymity and merely clean up the facts later after the stop gets made. It also facilitates this court's review of what he knew at the time of the stop. You could have an officer, though, that says, look, we had three or four people out there watching somebody, and it clearly came through to me that there was a traffic violation. And I'm 100 percent, I'm a million percent positive it came from one of my team members. But I can't tell you, I don't know who it was. It came through the radio as clear as day to me. Why is that not enough? Well, Your Honor, I think… So I don't know, it's not about going to the police station and cleaning things up or hiding behind anonymity. I think somebody could say we were watching the person, something came through the radio about a traffic violation, I pulled them over. But I can't swear under oath that it came from Jane or John. I have two answers, Your Honor. The first is that that would still permit some space to merely sort of pick out an officer from the group later on. But also, those aren't the facts here. What if the detectives say, I'm not trying to pick anybody out. My truthful testimony is I don't know who. What I can tell you is it was definitely somebody from my team. Yes, Your Honor. So I think that that would still permit some sort of shopping in the sense that any number of the officers could try to later establish probable cause when it wouldn't be clear how to establish that before the evidentiary hearing. But I'd also like to emphasize that that's different from what happened here, where the district court did determine that the communications were hectic and confusing, but also that not every member of this call was actually making the observation. So only Scheparsky and Fish were observing Mr. C here, but there were five different officers on the call, which I think distinguishes it from that fact pattern. But if the court has no further questions, I'd like to reserve the rest of my time. Thank you, Mr. Walter.  Mr. Whalen. Go ahead. May it please the court. Good morning, Your Honors. Nathaniel Whalen here on behalf of the United States of America. You know, Mr. C wants to say that this is a case about the legal principles of the Fourth Amendment, but I think Judge Scudder, you hit the nail on the head. This is a factual case. The district court had an evidentiary hearing in which it heard four of the five communicating officers testify. It had the police reports in front of it, and it made the determination that Detective Scheparsky, who saw the defendant roll through the two stop signs, conveyed that information to Officer Babcock. And in addition to the part of the report that Your Honor cites, I direct the court to pages 11 and 12 of the court's order. Specifically, at page 11, the court says, the court finds the hearing testimony of the police officers was credible, consistent, and reasonably explained the inconsistency in the officers' police reports. And then it continues going on to page 12, where the court talks about what the officers said. And it says, Scheparsky testified he informed everybody that the vehicle and driver had disregarded those two stop signs and requested that the vehicle have a traffic stop done on it by Officers Babcock and or Overley. So that's the court's finding right there. Scheparsky tells everyone that the defendant rolled through two stop signs, and it's Babcock who then effectuates the stop. So once we get there, then I think the only question is whether that finding was clearly erroneous because the defense has conceded that that's enough, that kind of direct, you pull that person over. Communication from one officer to another is where the collective knowledge doctrine applies. There is evidence to support the district court's finding in Scheparsky's testimony. I think Officer Babcock did testify consistently. Specifically, at page 38 of the evidentiary hearing, the AUSA says, you know, essentially, and I'm paraphrasing, in your report you indicated Detective Henderson relayed the information about the traffic violations. And now there's a quote. Today you seem to be indicating that was coming from Detective Scheparsky. And then Officer Babcock explains away the inconsistency. He agrees it's Scheparsky who told him this information. As a factual matter, the collective knowledge doctrine applies there. The defense is trying to take this court in areas that it's really never been in saying that the officer who effectuates the stop needs to know the source of the information. This case is actually a little bit further than the typical collective knowledge doctrine case because we have the officer who saw the stop explain the fact-supporting probable cause. He said, you know, I saw the defendant roll through two stop signs. And that's what the officer says as soon as he pulls up on the defendant and introduces himself. He says, my name's Officer Babcock, and I'm pulling you over because you rolled through two stop signs back there. Again, that's more than this court usually requires or has in most collective knowledge cases where one officer has probable cause and says, pull that guy over there and doesn't give any facts. And this court says that's enough. That's in Williams. That's in Navsgar. Even the Supreme Court has said basically an APB saying we want this individual. Without the particular identified source, that's enough for the collective knowledge doctrine to apply. I don't think that this court should accept the invitation to go beyond where the Supreme Court has extended the collective knowledge doctrine. I think this court should rule consistent with its case law. And unless this court has any further questions on the facts or the law, I'd be happy to answer. Otherwise, we would rest on our reefs. Thank you, Mr. Whalen. Thank you, Your Honors. Mr. Walter, we'll move to you for rebuttal. Thank you. The purpose of the collective knowledge doctrine requirements is to secure transfer of probable cause, but no such secure transfer was effectuated here. The district court found that the evidentiary hearing was credible, but Babcock there only said that they told me and didn't identify who. And although this court and the Supreme Court has made clear that what must be communicated can be fairly minimal, who must be identified? The government quotes the evidentiary hearing where the government lawyer urges Babcock to say that once Babcock starts talking because he simply doesn't say that Scheparsky was the one who told him. The district court here erred when it held that it was irrelevant how the information was communicated. In cases where there was not a pre-established investigative team, this court has always required more than merely close communication. That reasoning is necessary to prevent a stop from being done protecturally and merely filling in the cause later. For those reasons, we ask this court to reverse. Thank you. Thank you, Mr. Walter. Thank you, Mr. Whalen. The case will be taken under advisement.